EXHIBIT B

DECLARATION OF BRETT M.
SCHUMAN IN SUPPORT OF
PLAINTIFFS NAVCOM TECHNOLOGY,
INC. AND DEERE & COMPANY'S
RENEWED MOTION FOR PARTIAL
JUDGMENT AS A MATTER OF LAW
PURSUANT TO FED. R. CIV. P. 50(b)

1          UNITED STATES DISTRICT COURT

        FOR THE NORTHERN DISTRICT OF CALIFORNIA

2              SAN JOSE DIVISION

3

NAVCOM TECHNOLOGY INC., AND

4  DEERE & COMPANY,

                CASE NO.  CV-12-04175-EJD

5        PLAINTIFFS,

                SAN JOSE, CALIFORNIA

6      VS.

                APRIL 23, 2014

7  OKI SEMICONDUCTOR AMERICA INC.,

   ET AL.,              VOLUME 3

8

        DEFENDANTS.        PAGES 305 - 482

9

10

            TRANSCRIPT OF PROCEEDINGS

11      BEFORE THE HONORABLE EDWARD J. DAVILA

            UNITED STATES DISTRICT JUDGE

12

            A-P-P-E-A-R-A-N-C-E-S

13

14  FOR THE PLAINTIFFS:  MORGAN, LEWIS & BOCKIUS

                BY:  BRETT M. SCHUMAN

15                RYAN L. SCHER

            ONE MARKET, SPEAR STREET TOWER

16          SAN FRANCISCO, CALIFORNIA 94105

17

FOR THE DEFENDANTS:  NAGASHIMA & HASHIMOTO

18              BY:  MARC R. LABGOLD

                TAKAAKI NAGASHIMA

19                PATRICK J. HOEFNER

            12007 SUNRISE VALLEY DRIVE, SUITE 110

20          RESTON, VIRGINIA 20191

21    (APPEARANCES CONTINUED ON THE NEXT PAGE.)

22  OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, CRR

            CERTIFICATE NUMBER 8074

23          LEE-ANNE SHORTRIDGE, CSR, CRR

            CERTIFICATE NUMBER 9595

24

        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,

25  TRANSCRIPT PRODUCED WITH COMPUTER.

1

2

A P P E A R A N C E S: (CONT'D)

3

4      FOR THE DEFENDANTS:

5                          MAKMAN & MATZ

                           BY:  DAVID A. MAKMAN

6                          655 MARINER'S ISLAND BOULEVARD

                           SUITE 306

7                          SAN MATEO, CALIFORNIA 94404

8                          SHAW KELLER

                           BY:  ANDREW E. RUSSELL

9                          300 DELAWARE AVENUE, SUITE 1120

                           WILMINGTON, DETROIT 19801

10

11      ALSO PRESENT:        OKI ELECTRIC INDUSTRY CO., LTD

                           BY:  ISAO GOTO

12                         1-7-12 TORANOMON MINATO-KU

                           TOKYO 105-8460 JAPAN

13

14

15

16

17

18

19

20

21

22

23

24

25

1

INDEX OF PROCEEDINGS

2

FOR THE PLAINTIFFS:

3

PAUL GALYEAN

4
    DIRECT EXAM BY MR. SCHUMAN (RES.)    P. 308
    CROSS-EXAM BY MR. LABGOLD    P. 340

5
    REDIRECT EXAM BY MR. SCHUMAN    P. 457

6

7

INDEX OF EXHIBITS

8
                IDENT.    EVIDENCE

PLAINTIFFS':

9
| | |
|---|---|
| 158 | 324 |
| 205 | 329 |

10
| | |
|---|---|
| 56 | 331 |
| 165 | 336 |

11

DEFENDANTS':

12
| | |
|---|---|
| 1078 | 341 |

13
| | |
|---|---|
| 1009 | 359 |
| 1011 | 366 |

14
| | |
|---|---|
| 1013 | 383 |
| 1014 | 387 |

15
| | |
|---|---|
| 1169 | 390 |
| 1018 | 397 |

16
| | |
|---|---|
| 1016 | 400 |
| 1022 | 403 |

17
| | |
|---|---|
| 1028 | 417 |
| 1029 | 418 |

18
| | |
|---|---|
| 1031 | 420 |
| 1053 | 422 |

19
| | |
|---|---|
| 1054 | 423 |
| 1056 | 426 |

20
| | |
|---|---|
| 1065 | 428 |
| 1079 | 433 |

21
| | |
|---|---|
| 1046 | 437 |
| 1037 | 439 |

22
| | |
|---|---|
| 1038 | 442 |
| 1040 | 443 |

23
| | |
|---|---|
| 1024 | 447 |
| 1042 | 452 |

24

25

| | | |
|---|---|---|
| 1 | | SAN JOSE, CALIFORNIA  APRIL 23, 2014 |
| 2 | | P R O C E E D I N G S |
| 3 | 10:10AM | (COURT CONVENED.) |
| 4 | 08:43AM | (JURY IN AT 8:43 A.M.) |
| 5 | 08:43AM | THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD. |
| 6 | 08:43AM | THE JURY IS PRESENT.  ALL COUNSEL ARE PRESENT. |
| 7 | 08:43AM | DR. GALYEAN, SIR, YES.  GOOD MORNING.  IF YOU WOULD PLEASE |
| 8 | 08:43AM | RESUME THE STAND. |
| 9 | 08:43AM | I'LL INVITE YOU TO CONTINUE WITH YOUR EXAMINATION. |
| 10 | 08:43AM | (PLAINTIFFS' WITNESS, PAUL GALYEAN, WAS PREVIOUSLY SWORN.) |
| 11 | 08:43AM | MR. SCHUMAN:  THANK YOU, YOUR HONOR. |
| 12 | 08:43AM | DIRECT EXAMINATION (RESUMED) |
| 13 | 08:43AM | BY MR. SCHUMAN: |
| 14 | 08:43AM | Q.  DO YOU HAVE THE BINDER UP THERE? |
| 15 | 08:43AM | A.  NO, I DON'T. |
| 16 | 08:43AM | Q.  GOOD MORNING, DR. GALYEAN. |
| 17 | 08:44AM | A.  GOOD MORNING. |
| 18 | 08:44AM | Q.  I WOULD LIKE TO RETURN TO THE DOCUMENT AT TAB PX 271, |
| 19 | 08:44AM | PLEASE.  THIS IS WHERE WE WERE WHEN WE LEFT OFF YESTERDAY. |
| 20 | 08:44AM | AND WHEN WE BROKE FOR THE DAY WE WERE TALKING ABOUT THE |
| 21 | 08:44AM | PARAGRAPH AT THE BOTTOM OF PX 271.  THIS IS YOUR E-MAIL AND YOU |
| 22 | 08:44AM | SAID, "WHEN WE TALK TO RUBEN TODAY, ONE MAJOR QUESTION I'LL |
| 23 | 08:44AM | RAISE CONCERNS THE APPARENT ABSENCE OF PEREGRINE AND ACCO. |
| 24 | 08:44AM | PEREGRINE WERE THE SYSTEM ENGINEERS, AND ACCO THE CIRCUIT |
| 25 | 08:44AM | DESIGNERS.  IT SEEMS TO US THAT THEY SHOULD BE ALL OVER THIS |

| | | |
|---|---|---|
| 1 | 08:49AM | USE OF THE DISCRETE SOLUTION IN MORE AND MORE OF THE BUILDS AND |
| 2 | 08:49AM | PERHAPS EVENTUALLY IN THE PRODUCTS. |
| 3 | 08:49AM | Q.  DR. GALYEAN, AT SOME POINT DID NAVCOM RECEIVE A SECOND SET |
| 4 | 08:50AM | OF CHIPS FROM OKI? |
| 5 | 08:50AM | A.  WE DID IN JANUARY OF 2008. |
| 6 | 08:50AM | Q.  AND DID THAT SECOND SET OF CHIPS MEET THE SPECIFICATIONS |
| 7 | 08:50AM | THAT NAVCOM HAD PROVIDED? |
| 8 | 08:50AM | A.  NO. |
| 9 | 08:50AM | Q.  TURN FOR ME, PLEASE, TO DOCUMENT AT PX 267. |
| 10 | 08:50AM | AND THIS ONE IS ALREADY IN EVIDENCE, SO YOU CAN PUT IT UP |
| 11 | 08:50AM | ON THE SCREEN, JOHN.  THANK YOU. |
| 12 | 08:50AM | DR. GALYEAN, DO YOU RECOGNIZE THIS E-MAIL STRING THAT IS |
| 13 | 08:50AM | PX 267? |
| 14 | 08:50AM | A.  YES, I DO.  THE BOTTOM ONE IS A NOTE THAT I WROTE TO |
| 15 | 08:50AM | CRAIG FAWCETT AND MIKE LINDSAY AND IT'S FOLLOWED BY A COMMENT |
| 16 | 08:50AM | ON MY MESSAGE FROM JERRY KNIGHT. |
| 17 | 08:50AM | Q.  AND CAN YOU EXPLAIN FOR THE MEMBERS OF THE JURY, |
| 18 | 08:51AM | DR. GALYEAN, WHY YOU WROTE YOUR FEBRUARY 11TH, 2008, E-MAIL? |
| 19 | 08:51AM | A.  YES.  AT THIS POINT WE KNOW THAT THE PROBLEMS IN THE CHIPS |
| 20 | 08:51AM | REMAIN DEEP, PERVASIVE.  WE'RE TWO YEARS IN AT THIS POINT ON |
| 21 | 08:51AM | WHAT WE THOUGHT WAS A TEN MONTH DEVELOPMENT. |
| 22 | 08:51AM | SO WE HAD BEGUN TO LOSE CONFIDENCE THAT OKI IS EVER GOING |
| 23 | 08:51AM | TO DELIVER WORKING CHIPS.  AT THIS POINT OUR SCHEDULES ARE |
| 24 | 08:51AM | PRETTY IMPACTED.  WE JUST -- YOU KNOW, WE JUST LOST CONFIDENCE |
| 25 | 08:51AM | THAT OKI IS GOING TO DELIVER FOR US. |

| 1  | 08:55AM | THINKING ABOUT, YOU KNOW, WHAT ELSE, GIVEN WHERE WE ARE, WHAT |
| 2  | 08:55AM | ELSE SHOULD WE BE BUILDING INTO THESE PRODUCTS? |
| 3  | 08:55AM | Q.  SO WHY THEN DID NAVCOM STILL WANT THESE CHIPS FROM OKI IN |
| 4  | 08:55AM | 2008 IF THE CHIPS DID NOT HAVE THE CAPABILITY OF PROCESSING |
| 5  | 08:55AM | SIGNALS FROM, FOR EXAMPLE, THE GLONASS SYSTEM? |
| 6  | 08:55AM | A.  WELL, THE REASON IS THAT THE CHIPS COULD STILL ACCOMPLISH |
| 7  | 08:55AM | THEIR ORIGINAL PURPOSE.  THEY WOULD STILL SAVE THE ESTIMATED |
| 8  | 08:56AM | $39 OF COST. |
| 9  | 08:56AM | WE -- THEY WOULD STILL REPLACE THE 500 SEPARATE COMPONENTS |
| 10 | 08:56AM | FOR THE SATELLITE SIGNALS THAT WE ANTICIPATED BACK IN 2005.  SO |
| 11 | 08:56AM | THE CHIPS WOULD STILL HAVE CERTAINLY BEEN USEFUL.  WE WOULD |
| 12 | 08:56AM | HAVE TAKEN OUT THE 500 COMPONENTS AND PUT THE RF ASIC IN. |
| 13 | 08:56AM | AND IF WE ELECT TO DO GLONASS, THEN WE DO IT AS A SEPARATE |
| 14 | 08:56AM | DISCRETE SOLUTION.  WE PUT IN THE COMPONENTS, THE LITTLE |
| 15 | 08:56AM | INDIVIDUAL SEPARATE COMPONENTS THAT ARE REQUIRED TO DO GLONASS |
| 16 | 08:56AM | AND WE USE THE RF ASIC CHIPSET FOR THE SATELLITE SIGNALS THAT |
| 17 | 08:56AM | WE HAD ORIGINALLY DESIGNED IT FOR. |
| 18 | 08:56AM | SO IT STILL WOULD HAVE BEEN A USEFUL PRODUCT FOR US, A |
| 19 | 08:56AM | USEFUL COMPONENT FOR US. |
| 20 | 08:56AM | Q.  DR. GALYEAN, DID OKI EVER REPAIR OR REPLACE THESE CHIPS |
| 21 | 08:57AM | WITH CHIPS THAT MET THE SPECIFICATIONS? |
| 22 | 08:57AM | A.  NO. |
| 23 | 08:57AM | Q.  DID NAVCOM OR DEERE EVER GET CHIPS FROM OKI THAT MET THE |
| 24 | 08:57AM | SPECIFICATIONS? |
| 25 | 08:57AM | A.  NO. |

| 1 | 08:57AM | Q.  DR. GALYEAN, WHAT WAS THE EFFECT ON NAVCOM AND DEERE IN |
| 2 | 08:57AM | NOT GETTING CHIPS THAT MET THE SPECIFICATIONS? |
| 3 | 08:57AM | A.  THE EFFECT WAS THAT WE DON'T HAVE AN RF ASCI SOLUTION, SO |
| 4 | 08:57AM | WE HAVE TO LOOK AT, WHAT DO WE DO WITHOUT IT? |
| 5 | 08:57AM | IF WE HAD HAD IT, WE -- IF OKI HAD DELIVERED, YOU KNOW, |
| 6 | 08:57AM | WORKING CHIPS FOR US, THEN OUR OPTIONS WOULD HAVE BEEN MUCH |
| 7 | 08:57AM | BETTER.  WE WOULD HAVE TAKEN THAT DESIGN TO SOME OTHER VENDOR |
| 8 | 08:57AM | AND HAD THAT CHIP BOUGHT BY SOMEBODY ELSE. |
| 9 | 08:58AM | THE OTHER THING WE WOULD HAVE DONE IS EXERCISED OUR RIGHT |
| 10 | 08:58AM | IN THE CONTRACT UNDER SECTION I THINK IT'S 10 TO A LAST TIME |
| 11 | 08:58AM | BUY, WHICH MEANS THAT OKI WAS OBLIGATED, IF WE HAD GOTTEN TO |
| 12 | 08:58AM | THIS STATE, AND THEN THEY HAD DECIDED TO CANCEL. |
| 13 | 08:58AM | MR. LABGOLD:  OBJECTION, YOUR HONOR. |
| 14 | 08:58AM | THE COURT:  CAN I SEE COUNSEL FOR A SECOND, PLEASE. |
| 15 | 08:58AM | (SIDE-BAR CONFERENCE ON THE RECORD.) |
| 16 | 08:58AM | THE COURT:  WE'RE AT SIDE-BAR. |
| 17 | 08:58AM | MR. LABGOLD:  YOUR HONOR'S CLARIFICATION LAID OUT IN |
| 18 | 08:58AM | GREAT DETAIL ALL OF THE IF'S THAT WOULD HAVE HAD TO HAVE |
| 19 | 08:58AM | OCCURRED IN ORDER FOR THIS LAST TIME BUY TO OCCUR AND YOU STILL |
| 20 | 08:58AM | FOUND THAT THESE WERE UNRECOVERABLE. |
| 21 | 08:58AM | HE'S NOW SAYING IF THIS, IF THIS, AND THIS ALL GOES |
| 22 | 08:59AM | AGAINST WHAT WAS STATED IN THE ORDER, THE CLARIFICATION ORDER, |
| 23 | 08:59AM | BECAUSE IT WOULD ESSENTIALLY VITIATE THE RIGHT TO TERMINATE. |
| 24 | 08:59AM | IT WOULD LEAVE US IN INDENTURED SERVITUDE FOREVER. |
| 25 | 08:59AM | MR. SCHUMAN:  WELL, YOUR HONOR, IN NO ORDER HAS THE |

316

1   09:00AM   (END OF DISCUSSION AT SIDE-BAR.)

2   09:00AM      THE COURT:  THANK YOU, COUNSEL.

3   09:00AM   MR. SCHUMAN, YOU CAN ASK YOUR QUESTION AGAIN, PLEASE.

4   09:00AM      MR. SCHUMAN:  THANK YOU, YOUR HONOR.

5   09:00AM      THE COURT:  THE OBJECTION IS OVERRULED, SO ASK THE

6   09:00AM   QUESTION.

7   09:00AM      MR. SCHUMAN:  THANK YOU, YOUR HONOR.

8   09:01AM   Q.  DR. GALYEAN, WHAT WAS THE EFFECT ON NAVCOM AND DEERE NOT

9   09:01AM   GETTING WORKING CHIPS THAT MET THE SPECIFICATION FROM OKI?

10  09:01AM   A.  THE EFFECT IS THAT WE DID NOT HAVE WORKING RF ASIC DESIGN.

11  09:01AM   IF WE HAD HAD THAT, WE WOULD HAVE TAKEN THAT DESIGN TO ANOTHER

12  09:01AM   VENDOR, ANOTHER MANUFACTURER.

13  09:01AM      EXCUSE ME.  EXCUSE ME.  EXCUSE ME.

14  09:01AM      AND WE WOULD HAVE HAD THE CHIP BUILT SOMEWHERE ELSE.

15  09:01AM      THE OTHER THING WE WOULD HAVE DONE TO TIE US OVER FROM

16  09:01AM   WHEN WE NEEDED THE CHIPS TO WHEN WE HAD THE CHIPS FROM ANOTHER

17  09:01AM   VENDOR WOULD HAVE BEEN TO EXERCISE OUR RIGHT IN THE CONTRACT TO

18  09:01AM   A LAST TIME BUY, WHICH IS A CONTRACT PROVISION THAT OBLIGATES

19  09:01AM   OKI TO, YOU KNOW, TAKE AN ORDER FOR PERHAPS A LARGE NUMBER OF

20  09:02AM   CHIPS, THE LAST TIME THEY'RE GOING TO PRODUCE THE CHIPS, AND

21  09:02AM   DELIVER THEM TO US.

22  09:02AM      SO WE WOULD HAVE -- WELL, WE WOULD HAVE BOUGHT A LARGE

23  09:02AM   NUMBER OF CHIPS TO TIE US OVER UNTIL WE GET THE CHIPS FROM

24  09:02AM   SOMEBODY ELSE.

25  09:02AM   Q.  DR. GALYEAN, THE CONTRACT IS IN FRONT OF YOU.  IT'S

| | | |
|---|---|---|
| 1 | 09:04AM | A.  YES, IT'S NORMAL IN SEMICONDUCTOR CONTRACTS TO HAVE THAT |
| 2 | 09:04AM | KIND OF AN AGREEMENT. |
| 3 | 09:04AM | Q.  OKAY.  THANK YOU. |
| 4 | 09:04AM | AND I THINK YOU ALSO SAID SOMETHING ABOUT TAKING THE |
| 5 | 09:04AM | DESIGN TO ANOTHER MANUFACTURER IF YOU HAD GOT WORKING CHIPS |
| 6 | 09:04AM | FROM OKI; IS THAT RIGHT? |
| 7 | 09:04AM | A.  YES. |
| 8 | 09:04AM | Q.  AND IN YOUR EXPERIENCE AND IN YOUR CAREER WITH PROJECTS |
| 9 | 09:04AM | LIKE THIS, HAVE YOU OR NAVCOM EVER DONE SOMETHING LIKE THAT |
| 10 | 09:04AM | BEFORE? |
| 11 | 09:04AM | A.  EXCUSE ME AGAIN. |
| 12 | 09:04AM | YES, WE HAVE.  IT'S RELATIVELY NORMAL TO DO THAT, TO TAKE |
| 13 | 09:04AM | A DESIGN FROM ONE MANUFACTURER TO ANOTHER. |
| 14 | 09:04AM | FOR EXAMPLE, NAVCOM TOOK A DESIGN FOR A CHIP WE CALLED THE |
| 15 | 09:04AM | C ASIC, WE TOOK THAT FROM ANOTHER MANUFACTURER TO OKI AND HAD |
| 16 | 09:05AM | THEM BUILD WHAT WE CALLED THE C-2 CHIP. |
| 17 | 09:05AM | WE DID THE SAME THING WITH ANOTHER CHIP.  WE CALLED IT THE |
| 18 | 09:05AM | M CHIP.  WE TOOK THAT FROM ANOTHER MANUFACTURER AND HAD OKI |
| 19 | 09:05AM | BUILD IT. |
| 20 | 09:05AM | SO IT'S RELATIVELY NORMAL TO MOVE CHIP DESIGNS. |
| 21 | 09:05AM | THE OTHER INSTANCE WOULD BE AT THE TIME WE WERE |
| 22 | 09:05AM | NEGOTIATING WITH OKI ABOUT THE RF ASIC, WE WERE NEGOTIATING AT |
| 23 | 09:05AM | THE SAME TIME FOR ANOTHER ASIC THAT IS USED IN THIS SAME |
| 24 | 09:05AM | GENERATION OF PRODUCTS. |
| 25 | 09:05AM | AND OKI DID THAT PROJECT SUCCESSFULLY, DELIVERED THE CHIPS |

| | | |
|---|---|---|
| 1 | 09:05AM | AS WE EXPECTED. |
| 2 | 09:05AM | BUT OVER TIME OKI PASSED THAT AGREEMENT ABOUT THE SECOND |
| 3 | 09:05AM | ASIC TO OTHER COMPANIES.  THE PRICE INCREASED FROM I THINK 20 |
| 4 | 09:06AM | SOMETHING DOLLARS PER CHIP UP TO ABOUT $50 PER CHIP. |
| 5 | 09:06AM | AND AT SOME POINT WE JUDGED THAT WE HAD AN UNRELIABLE |
| 6 | 09:06AM | SUPPLY SITUATION FOR ANOTHER CRITICAL COMPONENT AND WE TOOK |
| 7 | 09:06AM | THAT DESIGN THAT OKI HAD DONE FOR US, SUCCESSFUL DESIGN, AND |
| 8 | 09:06AM | TOOK IT TO ANOTHER VENDOR AND HAD IT BUILT ELSEWHERE.  AND THE |
| 9 | 09:06AM | COST IN THAT PARTICULAR INSTANCE CAME DOWN FROM 50 BUCKS TO |
| 10 | 09:06AM | ABOUT 20 BUCKS. |
| 11 | 09:06AM | SO THIS PROCESS OF MOVING A CHIP DESIGN FROM ONE VENDOR TO |
| 12 | 09:06AM | ANOTHER IS FAIRLY COMMON. |
| 13 | 09:06AM | Q.  AND YOU SPOKE ABOUT A NUMBER OF DIFFERENT CHIPS THERE, |
| 14 | 09:06AM | DR. GALYEAN, BUT I JUST WANT TO ASK YOU, THE DIGITAL ASIC, WHAT |
| 15 | 09:06AM | WAS THAT CHIP? |
| 16 | 09:06AM | A.  UM, THE CHIP I'M REFERRING TO THAT WE NEGOTIATED AT THE |
| 17 | 09:06AM | SAME TIME WITH OKI AS THE RF ASIC CHIP.  WE CALLED IT THE |
| 18 | 09:07AM | DIGITAL ASIC.  THE RF ASIC SERVES ONE PURPOSE AND THE DIGITAL |
| 19 | 09:07AM | ASIC SERVES A DIFFERENT PURPOSE, AND BOTH ARE COMPONENTS THAT |
| 20 | 09:07AM | WE HAVE IN THE PRODUCT TO MAKE IT WORK. |
| 21 | 09:07AM | Q.  AND AT SOME POINT DID NAVCOM TAKE THE DIGITAL ASIC FROM |
| 22 | 09:07AM | OKI MANUFACTURING TO SOME OTHER MANUFACTURER? |
| 23 | 09:07AM | A.  YES, THAT'S WHAT I WAS REFERRING TO.  OKI MANUFACTURED IT |
| 24 | 09:07AM | FIRST AND EVENTUALLY THAT CONTRACT, THAT DIGITAL CHIP WAS |
| 25 | 09:07AM | PASSED OFF TO SEVERAL OTHER COMPANIES.  AND WE JUDGED WE HAD AN |

| | | |
|---|---|---|
| 1 | 09:07AM | UNRELIABLE SUPPLY SITUATION AND WE TOOK THE DESIGN TO ANOTHER |
| 2 | 09:07AM | VENDOR AND HAD IT BUILT ELSEWHERE. |
| 3 | 09:07AM | Q.  AND WITH RESPECTS TO THAT DIGITAL ASIC CHIP, WHAT WAS THE |
| 4 | 09:07AM | PRICE THAT YOU WERE TO PAY OKI PER PART FOR THAT DIGITAL ASIC? |
| 5 | 09:07AM | A.  I DON'T RECALL THE EXACT PRICE.  IT WAS ON THE ORDER OF 20 |
| 6 | 09:07AM | SOMETHING ODD DOLLARS PER CHIP, I BELIEVE. |
| 7 | 09:07AM | Q.  AND THE REPLACEMENT MANUFACTURER THAT YOU TOOK IT TO, WHAT |
| 8 | 09:08AM | WAS THE PRICE THAT THEY WERE CHARGING YOU PER CHIP? |
| 9 | 09:08AM | A.  WELL, THE PRICE ESCALATED FROM OKI'S ORIGINAL PRICE OF 20 |
| 10 | 09:08AM | SOME DOLLARS, I BELIEVE.  AS IT WENT THROUGH THE HANDS OF TWO |
| 11 | 09:08AM | OTHER COMPANIES, THE PRICE GOT UP TO $50. |
| 12 | 09:08AM | AND AT THIS POINT WE TOOK THE DESIGN ELSEWHERE AND HAD IT |
| 13 | 09:08AM | BUILT BY ANOTHER COMPANY AND THE PRICE CAME DOWN TO 20. |
| 14 | 09:08AM | Q.  THANK YOU.  DR. GALYEAN, I WANT TO TAKE YOU BACK TO THE |
| 15 | 09:08AM | SECOND SET OF CHIPS, JANUARY 2008.  WHAT WAS NAVCOM'S CEO'S |
| 16 | 09:08AM | REACTION TO THE DELIVERY AND ANALYSIS OF THIS SECOND SET OF |
| 17 | 09:08AM | CHIPS? |
| 18 | 09:08AM | A.  CRAIG FAWCETT, THE CEO, WAS PRETTY UPSET AT THAT POINT IN |
| 19 | 09:08AM | TIME.  THE SECOND SET OF CHIPS -- WITH THE SECOND SET OF CHIPS, |
| 20 | 09:09AM | IT BECAME VERY CLEAR THAT THERE WERE STILL VERY DEEP PROBLEMS |
| 21 | 09:09AM | AND IT WAS CLEAR THAT THERE WAS GOING TO BE A LONG TIME BEFORE |
| 22 | 09:09AM | WE HAD WORKING CHIPS.  SO HE WAS PRETTY UPSET ABOUT IT. |
| 23 | 09:09AM | AND HE ASKED FOR A MEETING WITH OKI SENIOR MANAGEMENT TO |
| 24 | 09:09AM | TALK ABOUT THE SITUATION AND SEEK ASSURANCES FROM THEM ABOUT |
| 25 | 09:09AM | THEIR LEVEL OF COMMITMENT TO THE PROJECT. |

| | | |
|---|---|---|
| 1 | 09:13AM | TECHNICAL ISSUES ARISEN DURING THE DESIGN PROCESS, AND AS SUCH |
| 2 | 09:13AM | WE HAVE EVALUATED THE CURRENT RESPONSIBILITY STRUCTURE AND MADE |
| 3 | 09:13AM | ADJUSTMENTS TO IMPROVE THE COMMUNICATION FLOW." |
| 4 | 09:13AM | DR. GALYEAN, WAS THAT THE COMMITMENT TO THE PROJECT THAT |
| 5 | 09:13AM | NAVCOM WAS SEEKING FROM OKI? |
| 6 | 09:13AM | A.  YES, THAT'S HOW WE UNDERSTOOD IT. |
| 7 | 09:13AM | THIS LETTER IS TWO SENIOR MANAGERS AT OKI SAYING THAT THEY |
| 8 | 09:13AM | ARE COMMITTED TO THE -- TO MAKE THE BEST EFFORT POSSIBLE. |
| 9 | 09:13AM | AND, YES, WE REGARDED THIS AS A COMMITMENT FROM OKI AND WE |
| 10 | 09:13AM | RELIED ON IT. |
| 11 | 09:13AM | Q.  AND, DR. GALYEAN, AT SOME POINT DID OKI TELL NAVCOM HOW IT |
| 12 | 09:13AM | THEN PLANNED TO FIX THE THEN CURRENT PROBLEMS WITH THE CHIPS? |
| 13 | 09:13AM | A.  YES.  OKI AT THIS POINT HAD ENGAGED A COMPANY CALLED |
| 14 | 09:14AM | TAHOE RF TO ASSIST IN FIGURING OUT WHAT THE PROBLEMS IN THE |
| 15 | 09:14AM | CHIPS WERE. |
| 16 | 09:14AM | AND AT SOME POINT OKI AND TAHOE RF PROPOSED THAT -- THEY |
| 17 | 09:14AM | PROPOSED TWO THINGS.  ONE WAS THAT INSTEAD OF THREE CHIPS, |
| 18 | 09:14AM | LET'S USE FOUR CHIPS.  LET'S TAKE SOME OF THE FUNCTIONALITY |
| 19 | 09:14AM | THAT IS IN THE THREE CHIPS AND MOVE IT INTO A FOURTH CHIP. |
| 20 | 09:14AM | AND THEY PROPOSED A MAJOR REDESIGN OF SOME OF THE CIRCUITS |
| 21 | 09:14AM | IN THE THREE, THEN MAYBE FOUR CHIPS. |
| 22 | 09:14AM | Q.  DR. GALYEAN, WERE THERE ANY PROVISIONS IN THE CONTRACT |
| 23 | 09:14AM | ALLOWING OKI TO DO A REDESIGN THAT ADDED CHIPS TO THE THREE |
| 24 | 09:14AM | CHIP DESIGN? |
| 25 | 09:14AM | MR. LABGOLD:  OBJECTION TO THE EXTENT THAT HE'S |

| | | |
|---|---|---|
| 1 | 09:15AM | ASKING FOR A LEGAL CONCLUSION. |
| 2 | 09:15AM | MR. SCHUMAN:  I'M JUST ASKING FOR THE WITNESS'S |
| 3 | 09:15AM | UNDERSTANDING. |
| 4 | 09:15AM | THE COURT:  YOU'RE ASKING HIM WHETHER HE'S AWARE OF |
| 5 | 09:15AM | ANY COMMITMENT? |
| 6 | 09:15AM | MR. SCHUMAN:  ANY PROVISIONS IN THE CONTRACT, YOUR |
| 7 | 09:15AM | HONOR, ALLOWING OKI TO PROPOSE A FOUR CHIP ARCHITECTURE OR |
| 8 | 09:15AM | DESIGN. |
| 9 | 09:15AM | THE COURT:  ALL RIGHT.  I'LL ALLOW IT AS TO HIS |
| 10 | 09:15AM | UNDERSTANDING IN THE AGREEMENT. |
| 11 | 09:15AM | YOU CAN ANSWER THE QUESTION, SIR. |
| 12 | 09:15AM | THE WITNESS:  THE CONTRACT ISN'T -- DOESN'T ADDRESS |
| 13 | 09:15AM | WHETHER THE RF ASIC IS THREE CHIPS OR FOUR CHIPS. |
| 14 | 09:15AM | THE CONTRACT IS FOR AN RF ASIC.  IF IT WERE ONE CHIP, THAT |
| 15 | 09:15AM | WOULD BE IDEAL.  IF IT'S TWO, OKAY.  IF IT'S THREE, OKAY.  IF |
| 16 | 09:15AM | IT HAS TO BE FOUR, OKAY. |
| 17 | 09:15AM | IT'S LESS DESIRABLE AS THE NUMBER OF CHIPS GOES UP BECAUSE |
| 18 | 09:15AM | THERE'S MORE INTERCONNECTIONS AND RELIABILITY GOES DOWN. |
| 19 | 09:15AM | BUT THE CONTRACT IS FOR AN RF ASIC.  AND OKI'S DESIGNERS |
| 20 | 09:16AM | AT THE BEGINNING HAD SETTLED INTO A THREE CHIP DESIGN AND THAT |
| 21 | 09:16AM | WAS ACCEPTABLE TO US. |
| 22 | 09:16AM | SO IN MY UNDERSTANDING, THE CONTRACT DOESN'T SAY ONE, TWO, |
| 23 | 09:16AM | THREE OR FOUR.  IT SAYS RF ASIC. |
| 24 | 09:16AM | BY MR. SCHUMAN: |
| 25 | 09:16AM | Q.  AND JUST GOING BACK TO PX 125 FOR A MOMENT, AND BEING |

| 1 | 09:16AM | MINDFUL OF THE JUDGE'S RULING, ARE THERE ANY PROVISIONS IN THE |
|---|---------|----------------------------------------------------------------|
| 2 | 09:16AM | CONTRACT THAT FORM THE BASIS FOR YOUR PERSONAL UNDERSTANDING AS |
| 3 | 09:16AM | YOU JUST TESTIFIED A MOMENT AGO? |
| 4 | 09:16AM | A.  IN THE CONTRACT, AS WE HAVE TALKED ABOUT EARLIER, IT |
| 5 | 09:16AM | MENTIONS THAT THE SPECIFICATION HAS TBD'S AND THINGS ARE TO BE |
| 6 | 09:16AM | FILLED IN AND THINGS ARE TO BE WORKED OUT AS WE GO ALONG. |
| 7 | 09:16AM | IN THE SPECIFICATION, VERSION 19, IT TALKS ABOUT THE MOST |
| 8 | 09:17AM | LIKELY SOLUTION BEING THREE CHIPS.  IT ISN'T SAYING THAT THERE |
| 9 | 09:17AM | ARE NECESSARILY GOING TO BE THREE CHIPS.  IT'S JUST SAYING THAT |
| 10 | 09:17AM | THAT IS A MOST LIKELY ARCHITECTURE FOR THE RF ASIC. |
| 11 | 09:17AM | Q.  DR. GALYEAN, THE DOCUMENT IS UP ON THE SCREEN. |
| 12 | 09:17AM | A.  I'M SORRY. |
| 13 | 09:17AM | Q.  CAN YOU JUST READ THE PORTION THAT YOU'RE REFERRING TO FOR |
| 14 | 09:17AM | THE MEMBERS OF THE JURY?  IT'S IN FRONT OF YOU. |
| 15 | 09:17AM | A.  YEAH.  I'M TRYING TO SEE WHICH PART IS IN FRONT OF ME. |
| 16 | 09:17AM | RIGHT.  IN THE FIRST MAJOR PARAGRAPH OF THE SPECIFICATION |
| 17 | 09:17AM | VERSION 19, THE SCOPE PARAGRAPH, IT SAYS "THE TERM RF ASIC |
| 18 | 09:17AM | COULD REFER TO A SINGLE MONOLITHIC PART, BUT WILL MORE LIKELY |
| 19 | 09:18AM | BE A SET OF INDIVIDUALLY PACKAGED IC'S.  THE MOST LIKELY |
| 20 | 09:18AM | PARTITION CURRENTLY IS TO HAVE THREE IC'S." |
| 21 | 09:18AM | AND IT GOES ON TO TALK ABOUT WHAT IS IN THE THREE IC'S. |
| 22 | 09:18AM | THAT'S THE PART I'M REFERRING TO. |
| 23 | 09:18AM | Q.  AND WAS IT YOUR UNDERSTANDING OF THAT LANGUAGE THAT OKI |
| 24 | 09:18AM | WAS ALLOWED TO COME BACK AND PROPOSE DOING THE SPECIFICATIONS |
| 25 | 09:18AM | IN FOUR IC'S? |

| | | |
|---|---|---|
| 1 | 09:18AM | A.  YES, THAT LANGUAGE PERMITS THAT.  AS I SAID, THE CONTRACT |
| 2 | 09:18AM | IS FOR AN RF ASIC.  IT ISN'T FOR ONE, TWO, THREE OR FOUR. |
| 3 | 09:18AM | THAT'S WHAT THE DESIGNERS ARE TO DO.  THEY'RE TO FIGURE OUT |
| 4 | 09:18AM | WHAT IS THE BEST WAY TO BUILD THE RF ASIC IS. |
| 5 | 09:18AM | Q.  OTHER THAN THIS LANGUAGE, DR. GALYEAN, IS THERE ANY OTHER |
| 6 | 09:18AM | LANGUAGE IN THE CONTRACT THAT FORMED THE BASIS FOR YOUR |
| 7 | 09:18AM | UNDERSTANDING THAT THE CONTRACT ALLOWED OKI TO COME BACK AND |
| 8 | 09:18AM | PROPOSE MEETING YOUR SPECIFICATIONS IN FOUR IC'S INSTEAD OF |
| 9 | 09:19AM | THREE? |
| 10 | 09:19AM | A.  THE -- EXCUSE ME.  THE CONTRACT HAS WHAT WE CALL THE |
| 11 | 09:19AM | LIVING DOCUMENT LANGUAGE ABOUT THE SPECIFICATION.  IT SAYS THAT |
| 12 | 09:19AM | IT IS GOING TO -- IT'S EXPECTED TO CHANGE, IT'S GOING TO |
| 13 | 09:19AM | CHANGE.  AND THE INTENT OF THAT IS TO FILL IN TECHNICAL DETAILS |
| 14 | 09:19AM | AS WE GO ALONG AND TO GIVE OKI THE GREATEST FLEXIBILITY TO |
| 15 | 09:19AM | DESIGN THE CHIP.  THAT LANGUAGE IS IN THE AGREEMENT IN SEVERAL |
| 16 | 09:19AM | PLACES. |
| 17 | 09:19AM | Q.  SO, DR. GALYEAN, WHAT WAS NAVCOM'S REACTION TO OKI'S PLAN |
| 18 | 09:19AM | TO FIX THE PROBLEMS IN THE CHIPS BY -- WITH A FOUR CHIP DESIGN? |
| 19 | 09:19AM | A.  OUR REACTION WAS GRUDGING ACCEPTANCE.  FOUR IS WORSE THAN |
| 20 | 09:20AM | THREE, THREE IS WORSE THAN TWO, TWO IS WORSE THAN ONE. |
| 21 | 09:20AM | BUT IF FOUR IS WHAT OKI IS REQUIRED TO GET US A WORKING |
| 22 | 09:20AM | RF ASIC, IT'S ACCEPTABLE.  SO WE AGREED.  SO WE AGREED TO THAT |
| 23 | 09:20AM | APPROACH. |
| 24 | 09:20AM | Q.  AND WHY IS FOUR WORSE THAN THREE? |
| 25 | 09:20AM | A.  FOUR IS WORSE THAN THREE BECAUSE THERE ARE MORE CHIPS. |

| 1 | 09:25AM | WHO IS NCT? |
| 2 | 09:25AM | A.  NCT IS NAVCOM TECHNOLOGY. |
| 3 | 09:25AM | Q.  AND THEN YOU SAID, "THIS IS NOT A CONTRACTUAL ISSUE, AS |
| 4 | 09:25AM | THERE IS NO REQUIREMENT OR ALLOWANCE IN THE AGREEMENT FOR US TO |
| 5 | 09:25AM | SAY YES OR NO ONCE THE CONTRACT IS UNDERWAY." |
| 6 | 09:25AM | WHAT DID YOU MEAN? |
| 7 | 09:25AM | A.  THE CONTRACT DOESN'T ADDRESS THE ISSUE OF THREE OR FOUR |
| 8 | 09:25AM | CHIPS AND IT MAKES NO PROVISION FOR NAVCOM SAYING GO OR NO-GO |
| 9 | 09:25AM | ABOUT THIS. |
| 10 | 09:25AM | WHAT TAHOE IS DOING IS RECOGNIZING THAT THEY ARE ABOUT TO |
| 11 | 09:26AM | ENGAGE IN A LONG PROCESS OF DOING THE MAJOR REDESIGN AND |
| 12 | 09:26AM | PARTITIONING THE FUNCTIONS INTO FOUR CHIPS INSTEAD OF THREE. |
| 13 | 09:26AM | AND THEY'RE WANTING TO MAKE SURE THAT NAVCOM IS REALLY |
| 14 | 09:26AM | OKAY WITH THAT.  THERE'S NOTHING IN THE CONTRACT THAT SAYS THAT |
| 15 | 09:26AM | THIS IS REQUIRED OR PERMITTED.  IT'S JUST TAHOE WANTED NAVCOM'S |
| 16 | 09:26AM | ASSURANCE THAT WE REALLY WERE OKAY WITH GOING DOWN THIS PATH |
| 17 | 09:26AM | BEFORE THEY BEGAN TO PUT LARGE AMOUNTS OF EFFORT INTO IT. |
| 18 | 09:26AM | Q.  DR. GALYEAN, I WANT TO DIRECT YOUR ATTENTION TO PARAGRAPH |
| 19 | 09:26AM | 14, THE ONE RIGHT BELOW 13. |
| 20 | 09:26AM | A.  RIGHT. |
| 21 | 09:26AM | Q.  AND IN PARAGRAPH 14 YOU SAY, "THERE ARE SEVERAL MINOR |
| 22 | 09:26AM | ACTION ITEMS." |
| 23 | 09:26AM | A.  RIGHT. |
| 24 | 09:26AM | Q.  AND NUMBER -- I JUST WANT TO DIRECT YOUR ATTENTION TO C, |
| 25 | 09:27AM | "NEED TO REVISE AGREEMENT WITH OKI TO REFLECT THE FOUR CHIP |

| | | |
|---|---|---|
| 1 | 09:27AM | SOLUTION AND ITS PRICING." |
| 2 | 09:27AM | WHY DID YOU WRITE THAT? |
| 3 | 09:27AM | A.   THE -- ALL OF THE SPECIFICATIONS SINCE 19 AND ONWARD THAT |
| 4 | 09:27AM | WE WORKED WITH OKI AND THEIR TEAM WITH, INCLUDING 25, THE ONE |
| 5 | 09:27AM | THAT IS IN THE AMENDMENT, ALL OF THOSE HAD BECOME THE TECHNICAL |
| 6 | 09:27AM | DETAILS ABOUT THREE CHIPS THAT WERE BEING FILLED IN. |
| 7 | 09:27AM | SO AS I MENTIONED YESTERDAY, FOR INSTANCE, THE PINOUTS ON |
| 8 | 09:27AM | THE CHIPS HAD GOTTEN DEFINED FOR THREE CHIPS. |
| 9 | 09:27AM | SO IF OKI AND TAHOE WANTED TO GO DOWN TO A FOUR CHIP |
| 10 | 09:27AM | SOLUTION, A LOT OF THE -- OR SOME OF THE TECHNICAL DETAILS ARE |
| 11 | 09:27AM | GOING TO CHANGE AT THAT POINT.  PINOUTS IS A GOOD EXAMPLE. |
| 12 | 09:27AM | IF YOU HAVE FOUR CHIPS, THE SIGNALS ARE GOING TO BE |
| 13 | 09:28AM | DIFFERENT ON THE FOUR CHIPS THAN THEY WERE ON THE THREE.  SO |
| 14 | 09:28AM | THE SPECIFICATION SHOULD BE REVISED TO REFLECT THE CHANGED |
| 15 | 09:28AM | TECHNICAL CONFIGURATIONS. |
| 16 | 09:28AM | SO THAT'S WHAT I'M REFERRING TO HERE. |
| 17 | 09:28AM | Q.   AND, DR. GALYEAN, JUST BOUNCING BACK TO PARAGRAPH 13, AT |
| 18 | 09:28AM | SOME POINT DID NAVCOM GIVE TAHOE AND OKI EITHER A GO OR A NO-GO |
| 19 | 09:28AM | DECISION ON THE FOUR CHIP DESIGN? |
| 20 | 09:28AM | A.   WE DID.  WE SAID GO. |
| 21 | 09:28AM | Q.   OKAY.  AND, DR. GALYEAN, AFTER THIS, AT SOME POINT DID |
| 22 | 09:28AM | THERE COME A TIME WHEN OKI CAME BACK TO NAVCOM AND ASKED FOR |
| 23 | 09:28AM | MORE MONEY FOR THIS PROJECT? |
| 24 | 09:28AM | A.   YES.  YES.  SOMEWHAT LATER OKI REQUESTED VERY SIGNIFICANT |
| 25 | 09:28AM | ADDITIONAL FUNDING FROM NAVCOM.  THEY ASKED US TO CONTRIBUTE TO |

| | | |
|---|---|---|
| 1 | 09:29AM | THE NONRECURRING ENGINEERING COST. |
| 2 | 09:29AM | THEY TOLD US THAT THE COSTS OF DOING THIS DEVELOPMENT ARE |
| 3 | 09:29AM | FAR EXCEEDING WHAT THEY ARE EXPECTED WHEN THEY ENTERED THE |
| 4 | 09:29AM | CONTRACT. |
| 5 | 09:29AM | THEY ASKED NAVCOM FOR AN ADDITIONAL $860,000 ON TOP OF THE |
| 6 | 09:29AM | 420 THAT WE PAID AT THAT POINT. |
| 7 | 09:29AM | THE CONTRACT HAD OBLIGATED US TO 570 AND WE PAID 420 AT |
| 8 | 09:29AM | THIS POINT, AND THEY ASKED FOR ANOTHER 860,000 FROM NAVCOM. |
| 9 | 09:29AM | Q. AND WHAT WAS THE REACTION WITHIN NAVCOM OF THAT REQUEST? |
| 10 | 09:29AM | A. WE WERE FAIRLY SHOCKED THAT THEY WOULD MAKE THAT KIND OF A |
| 11 | 09:29AM | REQUEST. YOU KNOW, THEY HAD ENTERED INTO A CONTRACT TO PROVIDE |
| 12 | 09:29AM | AN RF ASIC CHIPSET FOR A CERTAIN AMOUNT OF MONEY, AND THEY HAD |
| 13 | 09:30AM | DONE THEIR DUE DILIGENCE BEFORE THE CONTRACT TO MAKE SURE THAT |
| 14 | 09:30AM | THEY COULD BUILD IT, AND THEY WERE CLEARLY ENCOUNTERING A LOT |
| 15 | 09:30AM | OF TECHNICAL DIFFICULTIES AND THERE WAS A LOT OF DELAY AT THIS |
| 16 | 09:30AM | POINT. |
| 17 | 09:30AM | WE ARE MORE THAN TWO YEARS IN AT THIS POINT, BUT THEY |
| 18 | 09:30AM | WOULD COME BACK AND SAY THAT JUST BECAUSE WE INCURRED -- WE'RE |
| 19 | 09:30AM | INCURRING A LOT OF ADDITIONAL COST, WE WOULD LIKE YOU, NAVCOM, |
| 20 | 09:30AM | TO PARTICIPATE AND PAY US MORE MONEY. |
| 21 | 09:30AM | WE WERE A LITTLE SURPRISED AND SHOCKED AT THAT. |
| 22 | 09:30AM | Q. AND WHAT WAS -- DID YOU RESPOND TO OKI ONE WAY OR ANOTHER |
| 23 | 09:30AM | ON THE REQUEST? |
| 24 | 09:30AM | A. WE DID. WE TURNED IT DOWN. THIS IS, IN OUR VIEW, NOT A |
| 25 | 09:30AM | REQUEST THAT WE'RE ABLE TO AGREE TO. |

| 1 | 09:48AM | Q.  AND IF WE GO TO THE NEXT LINE, "NOTWITHSTANDING THE |
| 2 | 09:48AM | FOREGOING, SELLER WILL NOT BE USING THE IP DESCRIBED ABOVE IN |
| 3 | 09:48AM | THE DEVELOPMENT OF THE PRODUCTS UNDER THIS AGREEMENT." |
| 4 | 09:48AM | DO YOU RECALL THAT? |
| 5 | 09:48AM | A.  YES. |
| 6 | 09:48AM | Q.  AND SO, IN FACT, AS THE AGREEMENT WAS WRITTEN, THESE |
| 7 | 09:48AM | SPECIFIC APPLICATIONS WERE IDENTIFIED AND INCLUDED WITH THE |
| 8 | 09:48AM | PROHIBITION THAT THAT COULD NOT BE USED BY OKI IN THE |
| 9 | 09:48AM | DEVELOPMENT OF THE PRODUCTS; CORRECT? |
| 10 | 09:48AM | A.  YES. |
| 11 | 09:48AM | Q.  SO THEN THEY WERE NOT BEING PROVIDED TO ASSIST OKI IN |
| 12 | 09:48AM | DEVELOPING THE HIGHEST, MOST EFFICIENT, BEST PRODUCT; CORRECT? |
| 13 | 09:48AM | A.  NO.  THEY WERE BEING PROVIDED FOR THAT PURPOSE.  OKI HAD |
| 14 | 09:48AM | DECIDED AT THAT POINT THAT THEY DID NOT AND WOULD NOT USE THEM, |
| 15 | 09:49AM | BUT THAT WAS THE REASON THAT THEY HAD BEEN PROVIDED. |
| 16 | 09:49AM | Q.  OH, I SEE.  SO THEY WERE PROVIDED FOR THE MOST |
| 17 | 09:49AM | EFFICIENT -- TO ENABLE THEM TO MAKE THE MOST EFFICIENT, BEST |
| 18 | 09:49AM | POSSIBLE, BUT BOTH PARTIES AGREE THAT THEY WOULDN'T BE USED; IS |
| 19 | 09:49AM | THAT CORRECT? |
| 20 | 09:49AM | A.  THAT'S CORRECT. |
| 21 | 09:49AM | Q.  NOW, YOU ALSO TESTIFIED ABOUT THE SPECIFICATION. |
| 22 | 09:49AM | AND IF WE GO TO THE END OF THIS DOCUMENT, WE GET TO THE |
| 23 | 09:49AM | DOCUMENT THAT IS IDENTIFIED AS VERSION 19; CORRECT? |
| 24 | 09:49AM | A.  YES. |
| 25 | 09:49AM | Q.  AND VERSION 19 WAS THE SPECIFICATION AT THE TIME THE |

| 1 | 09:49AM | AGREEMENT WAS EXECUTED; RIGHT? |
|---|---------|--------------------------------|
| 2 | 09:49AM | A.  YES. |
| 3 | 09:49AM | Q.  AND IF WE LOOK AT THE SECOND PAGE OF THE SPECIFICATION, |
| 4 | 09:49AM | AND THAT HAS PAGE NUMBER 8380 -- |
| 5 | 09:50AM | A.  YES. |
| 6 | 09:50AM | Q.  -- THIS FIGURE SHOWS A THREE CHIP CONFIGURATION; CORRECT? |
| 7 | 09:50AM | A.  YES. |
| 8 | 09:50AM | Q.  AND AT THE TIME THAT THE AGREEMENT WAS SIGNED, THAT WAS |
| 9 | 09:50AM | WHAT THE PARTIES INTENDED TO HAVE MADE; CORRECT? |
| 10 | 09:50AM | A.  THAT WAS OKI'S DECISION TO -- THEIR BEST JUDGMENT BASED ON |
| 11 | 09:50AM | THEIR ANALYSIS LEADING UP TO THE SIGNING OF THE AGREEMENT WAS |
| 12 | 09:50AM | THAT THEY WISHED THE DESIGN TO USE A THREE CHIP SOLUTION, YES. |
| 13 | 09:50AM | Q.  WELL, AT THE TIME THE AGREEMENT WAS SIGNED AND NAVCOM |
| 14 | 09:50AM | ENTERED INTO THIS AGREEMENT, WHAT WAS AGREED WAS THAT A THREE |
| 15 | 09:50AM | CHIP CHIPSET WOULD BE MADE; CORRECT? |
| 16 | 09:50AM | A.  WHAT WAS AGREED WAS THAT IT WAS MOST LIKELY, AND THE MOST |
| 17 | 09:50AM | LIKELY CURRENT PARTITION IS TO HAVE THREE SC'S. |
| 18 | 09:50AM | Q.  DID YOU NEGOTIATE A PRICE FOR WHAT THE CHIPSET WOULD COST? |
| 19 | 09:50AM | A.  YES. |
| 20 | 09:50AM | Q.  AND THE PRICE FOR THAT CHIPSET IS ON SCHEDULE D OF THE |
| 21 | 09:51AM | DOCUMENT; CORRECT? |
| 22 | 09:51AM | A.  YES. |
| 23 | 09:51AM | Q.  AND SCHEDULE D HAS BATES NUMBER 8263.  AND AT THE TOP OF |
| 24 | 09:51AM | THAT CHART IT HAS THE PRICING SCHEDULE; CORRECT? |
| 25 | 09:51AM | A.  CORRECT. |

| | | |
|---|---|---|
| 1 | 09:53AM | WE CHOSE TO DO IT ONCE.  HAD WE HAD OKI CONTINUE, WE |
| 2 | 09:53AM | PROBABLY WOULD HAVE DONE IT A SECOND TIME. |
| 3 | 09:54AM | Q.  THE BOTTOM LINE BEING, WHATEVER WAS WRITTEN IN THIS |
| 4 | 09:54AM | AGREEMENT YOU UNDERSTOOD AT THE TIME OF THE SIGNING WAS WHAT |
| 5 | 09:54AM | THE PARTIES HAD AGREED TO; CORRECT? |
| 6 | 09:54AM | A.  YES. |
| 7 | 09:54AM | Q.  AND NONE OF THE PREVIOUS DISCUSSIONS; CORRECT? |
| 8 | 09:54AM | A.  YEP. |
| 9 | 09:54AM | Q.  AND IF THERE WERE GOING TO BE CHANGES THAT WERE |
| 10 | 09:54AM | SIGNIFICANT, MATERIALLY CHANGING, YOU WOULD HAVE TO HAVE A |
| 11 | 09:54AM | FORMAL WRITTEN AGREEMENT; CORRECT? |
| 12 | 09:54AM | A.  I THINK SO.  AS YOU POINT OUT, I'M NOT A LAWYER.  MY |
| 13 | 09:54AM | UNDERSTANDING IS THAT BECAUSE OF THE LANGUAGE ABOUT WHAT I CALL |
| 14 | 09:54AM | THE LIVING SPECIFICATION, WE ARE GOING TO REVISE THAT SPEC TO |
| 15 | 09:54AM | REFLECT TECHNICAL PROGRESS AND CHANGES, AND AT SOME POINT IN |
| 16 | 09:54AM | TIME THOSE CHANGES ARE GOING TO BE FORMALLY INCORPORATED AS A |
| 17 | 09:54AM | WRITTEN AMENDMENT TO THIS AGREEMENT, YES. |
| 18 | 09:55AM | Q.  NOW ON SCHEDULE B, AND THAT'S ON PAGE 8261, THIS PROVIDES |
| 19 | 09:55AM | EACH PARTIES' RESPONSIBILITY; CORRECT? |
| 20 | 09:55AM | A.  YES. |
| 21 | 09:55AM | Q.  AND WHEN I SAY "EACH PARTY," I'M SAYING THE EACH PARTY TO |
| 22 | 09:55AM | THE CONTRACT, THAT BEING NAVCOM IS IDENTIFIED AS THE BUYER AND |
| 23 | 09:55AM | OKI SEMICONDUCTOR IS THE SELLER; CORRECT? |
| 24 | 09:55AM | A.  YES. |
| 25 | 09:55AM | Q.  AND NAVCOM IS RESPONSIBLE FOR SUPPLYING THE SPECIFICATION; |

| 1  | 09:55AM | CORRECT? |
|----|---------|----------|
| 2  | 09:55AM | A.  YES. |
| 3  | 09:55AM | Q.  AND AT THE TIME THAT NAVCOM PROVIDED THE SPECIFICATION TO |
| 4  | 09:55AM | OKI, IT WAS VERSION 19; CORRECT? |
| 5  | 09:55AM | A.  THERE WERE PRIOR VERSIONS SUPPLIED TO OKI PRE-SIGNING OF |
| 6  | 09:55AM | THE AGREEMENT.  WE NEGOTIATED ALL OF THOSE CHANGES WITH THE OKI |
| 7  | 09:55AM | TEAM. |
| 8  | 09:55AM | THE VERSION THAT EVENTUALLY WAS READY AND INCORPORATED |
| 9  | 09:56AM | INTO THE CONTRACT WHEN WE SIGNED IT WAS 19. |
| 10 | 09:56AM | Q.  AND, AGAIN, WHATEVER WAS DISCUSSED BEFORE THE CONTRACT, |
| 11 | 09:56AM | BECAUSE THE INTEGRATION CLAUSE -- I'M NOT TALKING ABOUT THAT. |
| 12 | 09:56AM | I'M TALKING ABOUT AT THE TIME OF THE AGREEMENT, THE |
| 13 | 09:56AM | SPECIFICATION THAT THE CONTRACT SAYS IS TO BE PROVIDED, WHAT |
| 14 | 09:56AM | NAVCOM PROVIDED WAS VERSION 19; CORRECT? |
| 15 | 09:56AM | A.  YES. |
| 16 | 09:56AM | Q.  AND AS THE SCHEDULE -- AS THE AGREEMENT STATES, IT WAS NOT |
| 17 | 09:56AM | COMPLETELY DEFINITIVE; CORRECT? |
| 18 | 09:56AM | A.  CORRECT. |
| 19 | 09:56AM | Q.  BECAUSE SOME OF THE ITEMS WERE TBD; CORRECT? |
| 20 | 09:56AM | A.  YES. |
| 21 | 09:56AM | Q.  NOW, WITH REGARD TO SCHEDULE C, THAT'S ON THE NEXT PAGE, |
| 22 | 09:56AM | THIS TALKS ABOUT THE DEVELOPMENT -- IF WE LOOK AT JUST THE |
| 23 | 09:56AM | HEADING -- DEVELOPMENT NRE CHARGES, ESTIMATED DEVELOPMENT TIME, |
| 24 | 09:56AM | AND ESTIMATED ENGINEERING PROTOTYPE TURNAROUND TIME. |
| 25 | 09:57AM | DO YOU SEE THAT? |

| 1 | 11:23AM | DO YOU SEE THAT? |
| 2 | 11:23AM | A. YES. |
| 3 | 11:23AM | Q. AND DO YOU RECALL THAT ABOUT THIS TIME IN FEBRUARY, IN |
| 4 | 11:23AM | FACT, THERE WAS A STATUS UPDATE TO REPORT ON WHAT THE ANALYSIS |
| 5 | 11:23AM | WAS FOR THE SECOND SET OF CHIPS; CORRECT? |
| 6 | 11:23AM | A. YES, I BELIEVE SO. THERE WAS -- WE HAD MANY OF THESE |
| 7 | 11:23AM | STATUS UPDATES, BUT, YES, I BELIEVE SO. |
| 8 | 11:23AM | Q. AND IF WE GO TO THE NEXT SLIDE, AND THAT'S ON PAGE 81290, |
| 9 | 11:23AM | THIS WAS A SUMMARY OF A DISCUSSION THAT HAD OCCURRED AT THE |
| 10 | 11:24AM | LAST MANAGEMENT CALL IN AUGUST OF 2007; CORRECT? |
| 11 | 11:24AM | A. YES. |
| 12 | 11:24AM | Q. AND SO THIS WAS AT THE TIME WHEN THE ANALYSIS HAD AT LEAST |
| 13 | 11:24AM | BEEN PERFORMED TO IDENTIFY WHAT THESE PROBLEMS, THESE MAJOR |
| 14 | 11:24AM | TECHNICAL ISSUES AND MINOR TECHNICAL ISSUES WERE WITH THE CHIP; |
| 15 | 11:24AM | CORRECT? |
| 16 | 11:24AM | A. RIGHT. |
| 17 | 11:24AM | Q. AND IF WE GO TO THE NEXT SLIDE, YOU SEE IN THE INTERIM |
| 18 | 11:24AM | PERIOD THE DESIGN RESOURCES SWITCHED FROM ACCO TO TAHOE IN |
| 19 | 11:24AM | SEPTEMBER OF '07. |
| 20 | 11:24AM | DO YOU SEE THAT? |
| 21 | 11:24AM | A. I DO. |
| 22 | 11:24AM | Q. AND BY TAPEOUT, ANOTHER WORD THAT WE SEE IN SOME OF THESE |
| 23 | 11:24AM | DOCUMENTS, THAT'S ACTUALLY THE LAST STEP BEFORE PERFORMING THE |
| 24 | 11:25AM | FUNCTIONS OF MAKING THE SEMICONDUCTOR CHIP; CORRECT? |
| 25 | 11:25AM | A. YES. |

| | | |
|---|---|---|
| 1 | 11:50AM | A.  I DON'T KNOW ABOUT -- THIS IS WHAT DATE?  THIS IS MARCH OF |
| 2 | 11:51AM | '08.  I DON'T REMEMBER GOING THROUGH IT, BUT I DON'T REMEMBER |
| 3 | 11:51AM | THE EXACT DATE OF WHICH TAHOE PROPOSED A FOUR CHIP SOLUTION AND |
| 4 | 11:51AM | A MAJOR REDESIGN. |
| 5 | 11:51AM | IF THIS POWERPOINT FOLLOWS THAT DISCUSSION, THEN WE KNEW |
| 6 | 11:51AM | ABOUT IT AT THAT POINT AND IT WOULD MEAN THAT WE SHOULD UPDATE |
| 7 | 11:51AM | THE SPECIFICATION. |
| 8 | 11:51AM | Q.  AND YOU UNDERSTOOD THAT IF THE PROJECT WAS GOING TO GO |
| 9 | 11:51AM | FORWARD WITH OKI INTO SOME NEW DESIGN, WHICHEVER DESIGN YOU |
| 10 | 11:51AM | CHOSE WAS GOING TO BE SUFFICIENTLY DIFFERENT FROM VERSION 25 |
| 11 | 11:51AM | THAT IT WAS GOING TO REQUIRE AN AMENDMENT TO THE AGREEMENT; |
| 12 | 11:51AM | CORRECT? |
| 13 | 11:52AM | A.  YEAH, WE WOULD CERTAINLY WANT TO -- I THINK THE TAHOE FOUR |
| 14 | 11:52AM | CHIP ISSUE WAS ON THE TABLE AT THIS POINT IF I REMEMBER |
| 15 | 11:52AM | CORRECTLY.  BUT CERTAINLY THAT WOULD MAKE US WANT TO AMEND THE |
| 16 | 11:52AM | SPECIFICATION FOR MULTIPLE REASONS. |
| 17 | 11:52AM | THE SPECIFICATION HAD GROWN TO BE SPECIFIC ABOUT THREE |
| 18 | 11:52AM | CHIPS, AND IF WE WERE GOING TO USE A FOUR CHIP SOLUTION, FOR |
| 19 | 11:52AM | INSTANCE, AS I SAID EARLIER, ALL OF THE PINOUTS WOULD CHANGE. |
| 20 | 11:52AM | SO WE WOULD UPDATE THE SPECIFICATION, YES. |
| 21 | 11:52AM | Q.  AND WHEN YOU SAY IT HAD GROWN TO BE SPECIFIC, IT WAS -- |
| 22 | 11:52AM | YOU WERE REFERRING TO THE FACT THAT AS IT EXISTED, THE |
| 23 | 11:52AM | SPECIFICATION WAS BASED ON A THREE CHIP CONFIGURATION; CORRECT? |
| 24 | 11:52AM | A.  RIGHT. |
| 25 | 11:52AM | Q.  IF WE CAN JUST TAKE A LOOK BACK AT THE SPECIFICATION, |

409

| 1 | 03:56PM | AT THESE PROBLEMS IF THINGS WERE WORKING RIGHT WITH THE |
| 2 | 03:56PM | DEVELOPMENT. |
| 3 | 03:56PM | THIS CHIP WAS VERY IMPORTANT TO US.  SO IT WAS, I BELIEVE, |
| 4 | 03:56PM | WORTH IT TO US TO INVEST OUR ENGINEERING TIME AND TRY TO MAKE |
| 5 | 03:56PM | SURE THAT THE RIGHT THINGS HAPPENED, THAT THE DESIGN WAS GOING |
| 6 | 03:56PM | TO WORK WHEN WE DID GO TO TAPEOUT. |
| 7 | 03:56PM | I'M SORRY.  LONG ANSWER.  I'M SORRY. |
| 8 | 03:56PM | Q.  I JUST WANT TO MAKE SURE WE STAY IN THE FIRST YEAR FROM |
| 9 | 03:57PM | DECEMBER OF '05 TO ABOUT DECEMBER OF '06. |
| 10 | 03:57PM | WHEN WAS THIS DESIGN REVIEW MEETING IN FRANCE THAT YOU |
| 11 | 03:57PM | SPOKE ABOUT? |
| 12 | 03:57PM | A.  I THINK IT WAS MAY OR JUNE OF '06.  I'M SURE IT'S ON THE |
| 13 | 03:57PM | RECORD SOMEWHERE.  BUT IT'S MAY OR JUNE OF '06. |
| 14 | 03:57PM | Q.  AND AT THIS POINT HAD THERE BEEN ANY SCHEDULE SLIPPAGE |
| 15 | 03:57PM | FROM OKI OR WAS OKI STILL PLANNING ON DELIVERING CHIPS ON |
| 16 | 03:57PM | SCHEDULE? |
| 17 | 03:57PM | A.  IT'S HARD TO REMEMBER WHAT SCHEDULE SLIP HAPPENED AT WHAT |
| 18 | 03:57PM | POINT IN TIME.  CERTAINLY WHEN THE CRITICAL DESIGN REVIEW IN |
| 19 | 03:57PM | FRANCE FAILED, THAT IMPLIED A SLIP BECAUSE THEY'RE GOING TO |
| 20 | 03:57PM | HAVE TO KEEP GOING BACK AND DOING ANALYSES AND DESIGN AND SO |
| 21 | 03:57PM | CERTAINLY THERE WAS A SLIP AT THAT POINT. |
| 22 | 03:57PM | WHETHER THERE WERE SOME AHEAD OF IT, I WOULD HAVE TO CHECK |
| 23 | 03:57PM | THE RECORD TO KNOW.  THERE WERE SOME THAT FOLLOWED IT. |
| 24 | 03:58PM | Q.  AND YOU USED THIS TERM "TAPEOUT," AND I THINK THIS CAME UP |
| 25 | 03:58PM | DURING CROSS-EXAMINATION.  CAN YOU JUST TELL THE MEMBERS OF THE |

| | | |
|---|---|---|
| 1 | 03:58PM | JURY, PLEASE, WHAT TAPEOUT IS IN RELATION TO WHEN CHIPS GET |
| 2 | 03:58PM | MADE? |
| 3 | 03:58PM | A.   TAPEOUT IS THE NAME FOR WHAT OCCURS WHEN ALL OF THE |
| 4 | 03:58PM | SIMULATIONS ARE DONE, THE DESIGNS ARE COMPLETE, THE PACKAGE IS |
| 5 | 03:58PM | ALL WRAPPED UP AND IT'S READY TO GO TO THE FABRICATION LINE AND |
| 6 | 03:58PM | BUILD THE CHIP.  IT'S THE ENTIRE DESIGN PACKAGE THAT TRANSFERS |
| 7 | 03:58PM | TO A FAB, A LINE WITH SEMICONDUCTORS ARE BUILT, CHIPS ARE |
| 8 | 03:58PM | BUILT.  IT'S THAT DESIGN PACKAGE THAT GOES SO YOU CAN BUILD THE |
| 9 | 03:58PM | CHIP. |
| 10 | 03:58PM | TAPEOUT IS THE POINT WHERE YOU SAY HERE'S THE DESIGN |
| 11 | 03:58PM | PACKAGE, AND LET'S GO BUILD THE CHIP. |
| 12 | 03:58PM | Q.   AND SO IS IT YOUR TESTIMONY THAT AT SOME POINT DURING THE |
| 13 | 03:58PM | FIRST YEAR OF THE CONTRACT OKI WAS PROPOSING TO GO TO TAPEOUT? |
| 14 | 03:58PM | A.   YES.  AND AS I SAID, IT WAS PREMATURE.  HAD TAPEOUT |
| 15 | 03:59PM | OCCURRED AT THAT POINT, THE CHIP WOULD HAVE FAILED. |
| 16 | 03:59PM | Q.   AND WHOSE DECISION WAS IT TO NOT GO TO TAPEOUT AND TO |
| 17 | 03:59PM | DELIVER PROTOTYPE CHIPS IN 2006? |
| 18 | 03:59PM | A.   THAT WAS -- AT THE END OF THE DAY IT WAS A JOINT DECISION, |
| 19 | 03:59PM | BUT IT WAS DRIVEN BY THE NAVCOM ENGINEER'S ANALYSIS OF THE DATA |
| 20 | 03:59PM | THAT THEY HAD SHOWING THAT IT SIMPLY WASN'T READY TO TAPEOUT, |
| 21 | 03:59PM | THE SYSTEM ENGINEERING QUESTIONS WERE NOT SATISFACTORILY |
| 22 | 03:59PM | ANSWERED. |
| 23 | 03:59PM | SO NAVCOM DROVE IT, BUT AT THE END ALL PARTIES CONCURRED |
| 24 | 03:59PM | WITH NOT TAPING OUT WHEN IT WAS FIRST PROPOSED. |
| 25 | 03:59PM | Q.   AT ANY POINT DURING THE FIRST YEAR OF THE CONTRACT, |

| | | |
|---|---|---|
| 1 | 04:19PM | PX 125, WAS STILL IN EXISTENCE? |
| 2 | 04:19PM | A.  YES. |
| 3 | 04:19PM | Q.  TURN FOR ME NEXT TO DX 1029. |
| 4 | 04:19PM | A.  YES. |
| 5 | 04:19PM | Q.  THIS IS ANOTHER NICK ORTYL E-MAIL THAT MR. LABGOLD ASKED |
| 6 | 04:19PM | YOU QUESTIONS ABOUT.  AND REMEMBER THERE WAS A LINE IN HERE AND |
| 7 | 04:19PM | YOU WERE ASKED SOME QUESTIONS ABOUT NICK ORTYL'S STATEMENT |
| 8 | 04:19PM | ABOUT, "I'D LIKE TO SHOP IT, SPECIFICATION, TO OTHER DESIGN |
| 9 | 04:19PM | HOUSES AND FABS." |
| 10 | 04:19PM | DO YOU RECALL THAT? |
| 11 | 04:19PM | A.  YES. |
| 12 | 04:19PM | Q.  DR. GALYEAN, WOULD NAVCOM HAVE BEEN SHOPPING THE DESIGN |
| 13 | 04:19PM | SPECIFICATION TO OTHER FABS IN APRIL OF 2008 IF OKI HAD |
| 14 | 04:20PM | DELIVERED WORKING CHIPS THAT MET THE SPECIFICATIONS AT ANY |
| 15 | 04:20PM | POINT PRIOR TO APRIL OF 2008? |
| 16 | 04:20PM | A.  NO, THAT WOULD HAVE BEEN IRRELEVANT.  NO, THERE WOULD HAVE |
| 17 | 04:20PM | BEEN NO REASON TO DO THAT.  NO. |
| 18 | 04:20PM | Q.  SWITCHING BACK TO THE WHITE BINDER, PX 165.  THIS IS THE |
| 19 | 04:20PM | TERMINATION LETTER. |
| 20 | 04:20PM | A.  YES. |
| 21 | 04:20PM | Q.  JULY 8TH, 2008; RIGHT? |
| 22 | 04:20PM | A.  YES. |
| 23 | 04:20PM | Q.  DID YOU BELIEVE THAT PRIOR TO THIS DATE, JULY 8TH, 2008, |
| 24 | 04:20PM | THE CONTRACT BETWEEN NAVCOM AND OKI HAD ALREADY BEEN |
| 25 | 04:20PM | TERMINATED? |

| 1 | 04:21PM | A. NO. |
| 2 | 04:21PM | Q. AND DID YOU BELIEVE PRIOR TO THIS DATE, JULY 8TH, 2008, |
| 3 | 04:21PM | THE CONTRACT HAD ALREADY BEEN ABANDONED? |
| 4 | 04:21PM | A. I'M SORRY. HAD ALREADY BEEN? |
| 5 | 04:21PM | Q. ABANDONED? |
| 6 | 04:21PM | A. NO, NO, CERTAINLY NOT. |
| 7 | 04:21PM | Q. AND WOULD YOU HAVE THOUGHT IT STRANGE, DR. GALYEAN, TO |
| 8 | 04:21PM | RECEIVE A TERMINATION LETTER IN JULY 8TH, 2008, REGARDING A |
| 9 | 04:21PM | CONTRACT THAT HAD ALREADY PREVIOUSLY HAD BEEN TERMINATED OR |
| 10 | 04:21PM | ABANDONED? |
| 11 | 04:21PM | A. YES. THAT WOULD HAVE SEEMED STRANGE, YES. |
| 12 | 04:22PM | MR. SCHUMAN: I DON'T HAVE ANY OTHER QUESTIONS, YOUR |
| 13 | 04:22PM | HONOR. |
| 14 | 04:22PM | THANK YOU, DR. GALYEAN. |
| 15 | 04:22PM | THE COURT: THANK YOU. DO YOU HAVE? RECROSS? |
| 16 | 04:22PM | MR. LABGOLD: YES. |
| 17 | 04:22PM | THE COURT: DO YOU THINK YOU'LL FINISH THEN IN |
| 18 | 04:22PM | THREE MINUTES? |
| 19 | 04:22PM | MR. LABGOLD: PROBABLY START LATER. |
| 20 | 04:22PM | THE COURT: I THINK THAT'S A GOOD IDEA. I'D HATE TO |
| 21 | 04:22PM | INTERRUPT YOU. WE'LL TAKE OUR EVENING RECESS AT THIS TIME, |
| 22 | 04:22PM | LADIES AND GENTLEMEN. |
| 23 | 04:22PM | DOCTOR, I'LL HAVE TO INVITE YOU BACK MONDAY THE 28TH, AT |
| 24 | 04:22PM | 9:00 O'CLOCK. |
| 25 | 04:22PM | AND PLEASE RECALL, LADIES AND GENTLEMEN, WE'RE NOT IN |

| 1  | 04:25PM | SO THERE'S AN OBJECTION TO EVERY SINGLE ONE OF THE SLIDES, |
|----|---------|-----------------------------------------------------------|
| 2  | 04:25PM | AND I BELIEVE IT'S A DIFFERENT OBJECTION THAN SOME OF THE OTHER |
| 3  | 04:25PM | ONES WE WERE DEALING WITH EARLIER THIS AFTERNOON WITH THE OTHER |
| 4  | 04:25PM | EXPERT. |
| 5  | 04:25PM | THIS, I BELIEVE, IS AN IMPROPER ATTEMPT TO REARGUE THE |
| 6  | 04:25PM | ISSUES THAT HAVE ALREADY BEEN RESOLVED, AND I KNOW THE COURT |
| 7  | 04:26PM | SAID THAT MR. HANSEN WILL BE TESTIFYING. |
| 8  | 04:26PM | MR. LABGOLD:  AND I THINK THIS IS ONE OF THOSE RARE |
| 9  | 04:26PM | MOMENTS WHERE WE HAVE AN ABSOLUTE AGREEMENT BECAUSE WE BELIEVE |
| 10 | 04:26PM | IT'S AN ATTEMPT TO REARGUE AN ISSUE THAT THE COURT HAS ALREADY |
| 11 | 04:26PM | RESOLVED. SO I DIDN'T INTEND TO ACTUALLY ARGUE IT BECAUSE I |
| 12 | 04:26PM | KNOW YOU'RE PRESSED FOR TIME, BUT WE CAN TRY AND WORK IT OUT, |
| 13 | 04:26PM | AND I APPRECIATE THE COURT BEING AVAILABLE ON FRIDAY SHOULD WE |
| 14 | 04:26PM | NEED FURTHER ASSISTANCE. |
| 15 | 04:26PM | THE COURT:  WELL, AS THEY SAY, I'M FROM THE |
| 16 | 04:26PM | GOVERNMENT.  I'M HERE TO HELP. |
| 17 | 04:26PM | MR. LABGOLD:  THANK YOU. |
| 18 | 04:26PM | THE COURT:  SO I'LL BE HERE FRIDAY SO IF YOU NEED ME |
| 19 | 04:26PM | AND JUST LET MS. GARCIA KNOW AND WE CAN SCHEDULE IT. |
| 20 | 04:26PM | MR. SCHUMAN:  THANK YOU. |
| 21 | 04:26PM | THE COURT:  OKAY.  THANK YOU. |
| 22 | 04:26PM | (COURT CONCLUDED AT 4:26 P.M.) |
| 23 |         |  |
| 24 |         |  |
| 25 |         |  |

1

2

3        CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

            _____

16          IRENE RODRIGUEZ, CSR, CRR

            CERTIFICATE NUMBER 8076

17

18

            DATED:  APRIL 23, 2014

19

20

21

22

23

24

25